LOUISE HAMBURGER, Respondent, *v.* CORNELL UNIVERSITY, Appellant.

Third Department, March 15, 1923.

Corporations — Cornell University is charitable corporation — payment of tuition does not deprive it of that character — no liability exists in favor of students for negligence of subordinate servants or for negligence of managing agents in selecting servants — Cornell University not liable in action by student at college of agriculture thereat to recover for loss of eye caused by explosion of chemicals during experiment — liability not imposed by Constitution, art. 8, §. 3.

Cornell University, incorporated by chapter 585 of the Laws of 1865, for educational and charitable purposes, was at the time of its incorporation and now is a charitable corporation, notwithstanding that a portion of its income is derived from tuition fees, and, therefore, is not liable for the negligence of its subordinate servants, nor is it liable for the negligence of its managing agents in selecting incompetent servants.

Accordingly, it is not liable to the plaintiff for the loss of her eye which was caused by an explosion of chemicals during an experiment that was being conducted in the regular course of her studies while she was a student at the State College of Agriculture at Cornell University, though said explosion may have been caused by the negligence of the subordinate servants of the university or of its managing agents in selecting incompetent servants.

Liability is not imposed upon Cornell University by section 3 of article 8 of the New York Constitution which provides that " all corporations shall have the right to sue and shall be subject to be sued in all courts in like cases, as natural persons," for that provision is not applicable to a situation where the corporation cannot be guilty of negligence as to one of its beneficiaries.

HASBROUCK, J., dissents in part, with opinion.

APPEAL by the defendant, Cornell University, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Broome on the 30th day of November, 1921, upon the verdict of a jury for $25,000, and also from an order entered in said clerk's office on the same day denying defendant's motion for a new trial made upon the minutes and granting plaintiff an extra allowance of costs.

*Mynderse Van Cleef* [*Frederick Collin* of counsel; *Oliver L. McCaskill* and *James T. Rogers* with him on the brief], for the appellant.

*Nash Rockwood* [*Harry P. Pendrick* and *Ellery C. Huntington, Jr.,* of counsel], for the respondent.

HINMAN, J.:

The plaintiff has a verdict of $25,000 for the loss of sight of an eye, resulting from an explosion of chemicals in the course

of an experiment which was being performed by her in the chemical laboratory of Cornell University as a part of her study of chemistry. She was a student in the department of home economics in the State College of Agriculture, which is owned by the State but administered by the defendant. A prescribed subject of her study was chemistry, and at the time of the explosion the students were conducting the experiment under the direction of the defendant's instructors and with chemicals supplied by the defendant. The negligence alleged and sought to be proved was that the defendant had not exercised due care in that it had not placed competent persons in charge of the dispensing of chemicals from the stock room from which the plaintiff received a portion of the chemicals used by her in the experiment and had not made proper tests of the chemicals before permitting their use by the students, even though they were purchased in bulk in the original packages from reputable and accredited manufacturers, chemists and dealers. The defendant denied that it was negligent in such respects and further defended upon the grounds (1) that it was an agent of a State institution and entitled to the immunity from suit enjoyed by the sovereign, and (2) that it was a charitable corporation and as such was not as to its students subject to the doctrine of *respondeat superior.*

This case has been before this court and the Court of Appeals upon the sufficiency of the complaint. (*Hamburger* v. *Cornell University,* 184 App. Div. 403; affd., 226 N. Y. 625.) The appeal came here from a decision of the Special Term (opinion not reported) overruling a demurrer so far as the ground of objection related to the liability of the defendant as a charitable corporation, upon the authority of *Goodman* v. *Brooklyn Hebrew Orphan Asylum* (178 App. Div. 682), but sustaining the demurrer upon the sole ground that Cornell University was a governmental instrument and agency. The order of the Special Term was reversed by this court, Mr. Justice WOODWARD writing. The opinion incidentally expressed the view that Cornell University was a charitable corporation but the decision of this court was simply to the effect that Cornell University was not administering a governmental activity or function. The order of this court, reversing the Special Term, was affirmed, without opinion, by the Court of Appeals. The report of the decision in that court states: " The Special Term sustained the demurrer on the ground that defendant was administering a government activity or function and was, therefore, absolved from liability for the negligence of its servants and agents." A question certified to the Court of Appeals was: " Does the complaint state facts sufficient to constitute a cause

of action? " This question was answered in the affirmative. The complaint alleged two causes of action. In each cause of action it was alleged that the defendant was *not* a charitable corporation. The Court of Appeals was passing upon a pleading and under the well-settled rule in such a case it was the duty of the court to assume the truth of the allegations of the complaint. It seems clear that the Court of Appeals did not pass upon the question whether the defendant was a charitable corporation and liable as such for the negligence of its agents or servants or for negligence of its managing officers in employing incompetent servants. The same is of course true of the previous decision of this court (184 App. Div. 403), which was thus affirmed by the Court of Appeals. In the light of this consideration as to just what was decided, we can easily understand what was meant by Mr. Justice WOODWARD when he concluded (at p. 407) as follows: " This, it seems to us, is a very complete answer to the theory on which this demurrer has been decided. Cornell University is not created for the purpose of undertaking any governmental function whatever. * * * It is not, therefore, freed from the obligations which attach to any other private corporation. It contracted with this plaintiff for the purpose of furnishing her an education in certain lines, and it owed her the duty of exercising reasonable care in the carrying out of that contract." The principle decided was bounded by the facts presented by the pleading and by the sole issue of law presented by the appeal. One of the assumed facts being that the defendant was *not* a charitable corporation, it is plain that Mr. Justice WOODWARD was properly applying the usual rule of care as the measure of the defendant's duty upon that assumption. The sole issue of law presented by the appeal related to the theory of undertaking a governmental function, which was resolved against the contention of the defendant. This left the defendant, so far as the pleading was concerned, in the status of an ordinary civil lay corporation.

The case now comes to us upon the proofs presented at the trial and we have properly before us at this time, unaffected by the previous decision, the question whether Cornell University is a charitable corporation and as such immune from liability to a beneficiary for the negligence of its subordinate servants or for the negligence of its managing officers in employing incompetent servants.

It is the contention of the plaintiff that Cornell University, while it might have been eleemosynary in its foundation, has by its activities ceased to be such. It is possible for a corporation

to be founded for a charitable purpose but in its activities to depart from its eleemosynary character; and also a corporation may be a mere lay civil corporation and yet engage in work of a charitable nature. In either case the corporation would not be a charitable institution in a legal sense.

The term " charitable " is frequently thought to mean simply the giving of alms, the relief of the poor and the care of the sick and distressed who are unable through poverty to adequately care for themselves. The term has, however, a broader significance denoting all the kindly inclinations which men ought to bear toward each other and which prompt them to promote the general welfare without respect to poverty or riches, class or condition, and free from all invidious distinctions. As used in this general sense the term " charitable " has a wide application to gifts proceeding from true benevolence for any purpose favorable to one's fellow men. In a legal and political sense, however, charitable purposes are confined within narrower limits and not all such benefactions, although they may meet the test of being the result of a true benevolent disposition, are legal charities. (*Buchanan* v. *Kennard*, 234 Mo. 117; 136 S. W. Rep. 415; *Wilson* v. *First National Bank of Independence*, 164 Ia. 402; 145 N. W. Rep. 948; *Perin* v. *Carey*, 24 How. [U. S.] 465.) " The essential elements of a public charity are that it is not confined to privileged individuals but is open, under needful and proper regulations, to the indefinite public. It is this indefinite, unrestricted quality that gives it its public character." (*Doyle* v. *Whalen*, 87 Me. 414, 425.) It manifests itself in benefactions actuated by love for mankind as distinguished from the love of kindred or intimate friends or close associates. (*Matter of Beekman*, 232 N. Y. 365.) It represents a gift of pure benevolence for a public purpose, unstained by personal, private or selfish considerations. The definition of Mr. Binney has often been cited with approval. (*People ex rel. New York Inst. for Blind* v. *Fitch*, 154 N. Y. 14, 32.) He defines a charitable or pious gift to be " whatever is given for the love of God, or for the love of your neighbor, in the catholic and universal sense — given from these motives and to these ends — free from the stain or taint of every consideration that is personal, private or selfish." (See *Price* v. *Maxwell*, 28 Penn. St. 35.)

In determining what are charitable purposes in a legal sense, we may refer to the statute of 43 Elizabeth (Chap. 4), which in regard to definition of charities was declaratory of the common law. (*Owens* v. *Missionary Society of M. E. Church*, 14 N. Y. 380.) The preamble of that statute is quoted in *Buchanan* v. *Kennard* (*supra*, 133). " Schools of learning " were there

included and have undoubtedly always been regarded as charitable institutions in this State. (*Owens* v. *Missionary Society of M. E. Church, supra; People ex rel. New York Inst. for Blind* v. *Fitch,* 154 N. Y. 14; *Butterworth* v. *Keeler,* 219 id. 446.) In the case of *Butterworth* v. *Keeler* (*supra*), Judge CARDOZO, writing for the court, said: " It is the established law in this State that a gift for the promotion of education or learning is a gift for charitable uses. * * * There is no conflict of opinion anywhere. The rule, of course, is different where the school or other institution is maintained for the profit of its owners. The purpose must be the promotion, not of private profit, but of public learning * * *. It is not charity to aid a business enterprise. But the fact that fees are charged is not controlling * * *. Most of our universities and hospitals would be excluded by such a test, yet universities and hospitals are unquestionably public charities. * * * What controls is not the receipt of income, but its purpose. Income added to the endowment helps to make it possible for the work to go on. It is only when income may be applied to the profit of the founders that business has a beginning and charity an end. The line of division is the same whether the gift is devoted to education or to the relief of the poor, the halt and the blind. Charity ministers to the mind as well as to the body."

The purpose and character of the defendant is to be sought in the act by which it was incorporated. (*Matter of De Peyster,* 210 N. Y. 216, 219; *Matter of Rockefeller,* 177 App. Div. 786.) Chapter 585 of the Laws of 1865 incorporated Cornell University, an examination of which shows clearly that the purpose of the university was educational and charitable; and so it is to-day. (Education Law, § 1033.) The trustees serve without pecuniary compensation or profit. There is an entire absence of pecuniary gain in any form inuring to the benefit of the founder, the incorporators, their successors, or the governing body. There is no capital stock, no stockholder, no dividends. Beyond dispute all of the income of the university, whether from tuition, rents, fees or other sources, is used to carry out the sole object for which it was created and exists — the education of those who attend it as students. Its doors are " open, under needful and proper regulations, to the indefinite public," for the study of arts, sciences, engineering, law, medicine, agriculture and veterinary medicine. The Agricultural College and the Veterinary College are institutions owned by the State and administered by Cornell University. In 1916, at the time of the accident, about 5,000 students were enrolled. There were about 600 professors and instructors. The assets of the defendant, consisting of real estate, securities and

cash, as inventoried by the treasurer were of the value of $21,600,000. Of this sum, $13,937,115.33 constituted the endowment fund in the aggregate. The total income was $3,225,228. The income was derived from Federal funds or grants, State grants or State-given securities, endowment funds, rents and tuition fees. The tuition fees for the year 1916 were $239,083. In the event of a surplus of income over expenditures it would be added to the foundation or permanent fund of the university and help to make it possible to widen and improve the educational work. For the year in question the disbursements exceeded the income in the sum of $34,854.59 and for prior years in the sum of $122,997. The cost of educating each student is very much in excess of what he pays and students in the Agricultural College, resident in this State, of whom the plaintiff was one, do not pay tuition fees. There is no suggestion that the requirement of the payment of tuition fees and for room rent and for board operates unjustly or in a discriminatory manner as to any class. The fact that students pay something toward their education and maintenance does not make the institution any the less a charitable one, where the foundation essentially makes possible the work it is carrying on and substantially contributes to it. As a matter of fact the partial payment by students of the cost of educating them makes it possible to extend the benefits of the university to a larger body of men and women in search of education than would otherwise be the case and so long as such contributions are not unreasonable and are not in such an amount that it could be said that the benevolence in the foundation is no longer substantially reflected in the benefits which it confers, then the institution is still charitable.

Our conclusion is that Cornell University is a charitable institution and is, therefore, not responsible for the negligence of its agents and servants, if injury was thereby caused to the plaintiff, a beneficiary of the charity. This is unquestionably the law of this State. (See *Hordern* v. *Salvation Army,* 199 N. Y. 233, 237, and cases cited.) As to strangers to a charitable corporation, the law of the State imposes liability for the negligence of its agents and servants. (*Hordern* v. *Salvation Army,* 199 N. Y. 233; *Kellogg* v. *Church Charity Foundation,* 203 id. 191; *Schloendorff* v. *New York Hospital,* 211 id. 125, 129.) In the cases of *Green* v. *Cornell University* (193 App. Div. 924; affd., 233 N. Y. 519) and *Breed* v. *Cornell University* (198 App. Div. 966; affd., 233 N. Y. 518) there was involved the liability of the defendant for the negligence of its employee in so driving an automobile upon a public highway as to negligently injure another user of the highway, a stranger to the defendant. The question whether Cornell University was

a charitable corporation was not involved because under the foregoing authorities such a corporation was not immune from liability to a stranger. The defense interposed was that the automobile was owned by and operated in the business of the State. In the instant case the plaintiff was not a stranger to the university but was a beneficiary.

It is the claim of the plaintiff, however, that the rule exempting a charitable corporation from liability to a beneficiary does not extend to a case of negligence of its managing officers in selecting incompetent servants. Such an exception to the rule has been quoted but not applied in the case of *Hordern* v. *Salvation Army* (*supra*, 236, 239), but in the case of *Goodman* v. *Brooklyn Hebrew Orphan Asylum* (178 App. Div. 682) it has been applied. In the *Hordern Case* (*supra*, 236) the case of *McDonald* v. *Massachusetts General Hospital* (120 Mass. 432), which was the leading authority relied upon in the *Goodman Case* (*supra*), and in numerous adjudications by other courts, was cited. It is significant to note, however, that the Court of Appeals, referring to the *McDonald Case* (*supra*) in the *Hordern* case, said of it: " In Massachusetts the exemption of certain hospitals from liability seems by the opinions of the Supreme Court to have been based rather on the theory that those institutions were governmental instrumentalities, than on their character as public charities, though they were recognized as such." Another case referred to in the *Hordern Case* (*supra*) in which the same reference is made to due care in selecting servants for a charitable corporation, is *Powers* v. *Massachusetts Homeopathic Hospital* (47 C. C. A. 122; 109 Fed. Rep. 294), the leading case in applying the doctrine of waiver of right to recover by a beneficiary. Judge LOWELL, of the United States Circuit Court, in concluding his opinion in that case, however, expressly disclaimed any decision as to the liability of the hospital in question if it had employed an incompetent servant. The fact is that the statement of such a rule was not necessary to the decision even in the *McDonald Case* (*supra*), where the expression originated in relation to the beneficiary of a charitable corporation (*Roosen* v. *Peter Bent Brigham Hospital*, 235 Mass. 66, 70), and reference to such a rule was not necessary to the decision in the *Hordern Case* (*supra*), since that case related to the rights of a person other than a beneficiary.

The only case in which such a rule has been fairly applied to the facts of the case is that of *Goodman* v. *Brooklyn Hebrew Orphan Asylum* (*supra*), decided by the Appellate Division in our Second Department. Since that decision rested upon an apparent holding to that effect in the *McDonald Case* (*supra*), it is important to note that the Massachusetts Supreme Court has recently interpreted its

former holding in that case and has said that the expression there used was " merely precautionary " and not decisive of any such proposition. (*Roosen* v. *Peter Bent Brigham Hospital, supra,* 70.) That case expressly holds to the contrary and it is now the settled law of Massachusetts that a charitable corporation is not liable for injury to a beneficiary, for the negligence, either of its managing officers in selecting incompetent servants and employees or of servants and employees selected with care. Chief Judge RUGG, writing for the court, says: " In *McDonald* v. *Massachusetts General Hospital,* 120 Mass. 432, occurs this cautious statement: ' The liability of the defendant corporation can extend no further than this: if there has been no neglect on the part of those who administer the trust and control its management, and if due care has been used by them in the selection of their inferior agents, even if injury has occurred by the negligence of such agents, it cannot be made responsible.' In substance this has been repeated in several subsequent decisions and in numerous adjudications by other courts where that decision has been cited. That sentence now is seized upon as basis for the argument that such a charitable corporation as a hospital should be held liable in damages for negligence of its managing officers in selecting incompetent subordinate agents. That sentence, however, was merely precautionary. It bounded the question presented by the facts then before the court. It simply showed the extent of the decision. It does not purport to be a comprehensive or exclusive statement. The correlative assertion, to the effect that there is liability of the hospital in cases where there has been carelessness on the part of the managers in the selection of servants and agents, is neither expressed nor implied. The discussion of the question now presented must be approached in the light of *McDonald* v. *Massachusetts General Hospital,* 120 Mass. 432, as a binding authority.

" There is no sound distinction in reason between the liability of a hospital for the negligence of its inferior agents and its liability for the carelessness of its managers. The conduct of both relates to the execution of the charity. The inferior agents usually work for pay, while the managing officers as matter of common knowledge generally undertake the administration of the public charity without compensation, solely out of public spirit in a desire to serve the general welfare. If the hospital is held responsible for their acts of negligence, the funds devoted to the relief of suffering humanity must be diverted in the one instance to the same extent and manner as in the other to the payment of claims wholly foreign to the purposes of the public trust. That being the ground of decision

in *McDonald* v. *Massachusetts General Hospital*, 120 Mass. 432, it is as applicable to the facts here alleged as to those there presented. * * * If a hospital is to be held responsible for negligent treatment of patients, there seems to us to be no sound ground for a distinction between the negligence of the managers of the hospital and the negligence of subordinate servants as a basis of liability. A sound ground for distinction between exoneration from liability for the negligence of managers and that of subordinate agents seems equally wanting. Since it is settled that there is no liability for negligence of the latter, it must follow that there is none for that of the former. Otherwise there would be no reason for not overruling *McDonald* v. *Massachusetts General Hospital, ubi supra.*

" The inevitable result of our own decisions is to relieve a hospital from liability for negligence of the managers in selecting incompetent subordinate agents, as well as for the negligence of such subordinate agents selected with care. This conclusion is supported by the great weight of authority in other jurisdictions."

The Supreme Court of Massachusetts further calls attention to the fact that in New York State (citing *Hordern* v. *Salvation Army*, 199 N. Y. 233) the rule of exoneration of a charitable corporation from liability to a beneficiary for the negligence of its servants or employees rests upon waiver by the beneficiary, saying: " This principle manifestly would exonerate the defendant in the case at bar." (*Roosen* v. *Peter Bent Brigham Hospital, supra,* 74.)

Thus the question may fairly be reopened by us, in the absence of a binding decision of our Court of Appeals. We are unable to conceive of any good reason for a rule which differentiates in the case of a charitable institution between negligence of a servant or agent in carrying out details of work assigned to him and negligence of an agent, although an officer of the corporation, in selecting the servant who causes the injury to a beneficiary of the charity. The foundation of our rule exempting charitable corporations from liability for the negligence of its servants, causing injury to beneficiaries, is that of waiver. (*Hordern* v. *Salvation Army, supra.*) It is not that the relation of master and servant does not exist between the charitable corporation and an employee but that the consequences of the application of the doctrine of *respondeat superior* are waived by the beneficiaries in accepting the benefits of the charity. While charitable institutions such as hospitals have been exempted from liability for the negligence of nurses and physicians because as between them and the hospital the doctrine of *respondeat superior* does not apply, one of the reasons assigned is that the physician is not subject to the direction of the

hospital as to the manner of performing his operation. The rule in such a case is additional to and independent of the rule of waiver in exempting such a charity and applies as well to a lay civil corporation supplying the services of a medical practitioner in connection with its undertaking. (*Schloendorff* v. *New York Hospital,* 211 N. Y. 125; *Allan* v. *State Steamship Co.,* 132 id. 91.) The rule as to the duty to select competent medical practitioners arose originally in the steamship cases because the steamship companies owed a duty imposed by statute to carry a duly qualified medical practitioner and a proper and necessary supply of medicines. In so far as such cases rest upon the principle that as between the physician and the company the relation of master and servant does not exist, they are illustrative of the reason for a similar rule applicable to hospitals in general, but there the analogy ends. The further qualification that in the case of a lay civil corporation, a corporation other than a charitable one, it would be responsible for negligence in selecting medical practitioners has apparently crept into the hospital cases in the course of applying old rules to new situations where there was no necessity for qualifying the statement of the old rule.

We hold to the doctrine, now the settled law of Massachusetts, and which we conclude to be a manifestly logical development of the law of our own jurisdiction, that a charitable corporation is not liable for injury to a beneficiary, for the negligence, either of its managing officers in selecting incompetent servants and employees or of servants and employees selected with care. This rule precludes a recovery by the plaintiff against Cornell University unless, as suggested by the respondent, the rule is somehow modified by the provision of our Constitution (N. Y. Const. art. 8, § 3) which provides that "all corporations shall have the right to sue and shall be subject to be sued in all courts in like cases as natural persons." This is not applicable to a situation where the corporation cannot be guilty of negligence as to one of its beneficiaries, being a charitable corporation and the injury having arisen in the course of carrying out the great charitable purpose for which it was founded and still exists. (*Roosen* v. *Peter Bent Brigham Hospital, supra,* 76.)

The judgment should be reversed upon the law and the complaint dismissed, with costs.

H. T. KELLOGG, Acting P. J., and KILEY, J., concur; HASBROUCK, J., votes for reversal and a new trial, with an opinion; VAN KIRK, J., not sitting.

HASBROUCK, J. (dissenting in part):

I dissent from the conclusion reached by Mr. Justice HINMAN and the majority of the court that the complaint in this action should be dismissed.

He has reached his conclusion upon the assumption of fact that Cornell University is a charitable and eleemosynary institution and that the plaintiff was a student at it.

The facts are that the plaintiff did not matriculate at the university but did at the State College of Agriculture. There is no relationship between these institutions except that the conduct and administration of the college is placed by law (Education Law, § 1039) under the university. It was further provided by that law that the university should receive no income, profit or compensation from the moneys appropriated by the State for the Agricultural College.

In the year 1915 there was appropriated by the State Legislature for the support and maintenance of the Agricultural College $939,338.26. (See Laws of 1915, chaps. 725, 726, 727, 728.) If there were no contractual relationship between the university and the plaintiff that she should receive charity in the form of education, then there was no room for the implication of an agreement on the part of the plaintiff to waive the negligence of the servants of the university. It is true that there was accorded to the plaintiff the instruction and facilities of the chemical laboratory of the defendant. Such instruction and facilities came to the plaintiff not as the student of the university but as a student of the State Agricultural College. The university accorded to the State the right of its students to take a chemical course in the university. Notwithstanding the legislative provision that the university should have no income, profit or compensation from the moneys appropriated by the State for the Agricultural College the university used the college to educate its students in agriculture and the subjects particularly taught in the State College.

The relation between the two institutions was that of interchange of facilities.

The inference is plain that the university in the management and administration of both institutions undertook to compensate the State for the educational facilities of the Agricultural College by certain instruction and facilities in the university. Under these conditions it is a matter of little moment so far as the legal rule exists in the doctrine of *respondeat superior*, whether the plaintiff availed herself of the chemical course in the university for a *quid pro quo* furnished by the State to the university (*Buchanan*

v. *Tilden*, 158 N. Y. 109; *Seaver* v. *Ransom*, 224 id. 240; *DeCicco* v. *Schweizer*, 221 id. 437; *Lawrence* v. *Fox*, 20 id. 268) or as an invitee. (*Heskell* v. *Auburn Light, Heat & Power Co.*, 209 N. Y. 86.) The State did not pass its charity along to the university.

If I am right in describing the status of the plaintiff and restoring to the case the application of the rule of *respondeat superior* as to servants that there is no immunity on account of such doctrine to the managers must be plain. If it were otherwise it has not yet been held in this State that the managers and *alter egos* of charitable institutions are immune from that rule.

It seems to me that in the light of the authorities headed by *Hordern* v. *Salvation Army* (199 N. Y. 233), Presiding Justice JENKS of the Appellate Division of the Second Department was correct in stating the position of that court as follows: " This limitation has not been accepted without some criticism and protest, prompted often by the consideration that a judgment on such liability [that of the managers and trustees] none the less affects the defendant, but if, for that consideration or for any other, the principle should be unlimited, it should be thus declared by the Court of Appeals alone." (*Goodman* v. *Brooklyn Hebrew Orphan Asylum*, 178 App. Div. 683.)

If we are to ignore what our courts have held with regard to the liabilities of charitable institutions for the negligence of their managers and enter into the reasons for the rules which accord such institutions immunity, we may well inquire whether this rule of immunity with which the courts have hedged about these largely endowed institutions is not archaic and mediæval.

Assuming the fact of responsibility as found by the jury the plaintiff appealed for an education to charity and it plucked out her eye; she asked for bread and it gave her a stone. This is not the charity of the book of books describing charity for " charity suffereth long and is kind."

The reasons that existed in the early days of this country for encouraging the efforts of philanthropy in building and equipping hospitals and institutions of education should no longer be so controlling, for such efforts have resulted in the erection and maintenance of such institutions enjoying endowments and revenues beyond the imaginations of the early lawmakers.

I have no sympathy with the attempt of Mr. Justice HINMAN to take out of our law the doctrine of *respondeat superior* as it now exists (*Hordern* v. *Salvation Army, supra*) in respect to the liability of the trustees and managers of charitable and eleemosynary institutions for their negligence. He asserts that it is necessary to hold such doctrine in order to preserve the jewel of consistency,

and cites *McDonald* v. *Massachusetts General Hospital* (120 Mass. 432) as a controlling authority; the reason of that case being that if such institutions are immune for the negligence of their servants they ought to be immune from the consequences of the negligence of their other servants, the managers, trustees, superintendents and *alter egos*. It seems to me that the reason of the rule of non-immunity of such institutions on account of the negligence of trustees and managers, etc., is the sounder one, and I urge that the converse of Mr. Justice HINMAN's proposition should here be held in order that to be consistent we should hold such institutions not immune for the negligence of humbler servants. The tendency of the courts has been towards a more liberal rule of liability as to these institutions, and is exemplified in the case of *Breed* v. *Cornell University* (198 App. Div. 966; affd., 233 N. Y. 518; Workmen's Compensation Law). The reason for the doctrine of immunity from responsibility for the negligence of servants is found in the rule of law that an implied agreement to waive claims for injury based on negligence of servants grows out of the acceptance of charity. How an agreement to waive away a claim for damages for one's life, one's arm, one's leg or one's eye, can be implied where there is utter ignorance on the part of the recipient of charity that such an unconscionable deprivation of human right follows the acceptance of charity, I cannot fathom. (*Woods* v. *Ayers*, 39 Mich. 350.) And this waiver is generally implied and a contract thus made for children under the age of twenty-one seeking an education and incapable of making a contract. Then, too, it seems unreasonable that if there is to be immunity for such institutions it may not be exacted of strangers. Why not of strangers? Because no implied contract of waiver can be raised against them. It is beyond me why the indigent and poverty-stricken, who have to accept charity to get ahead in life and to live, should have precious rights denied them by such institutions, and strangers to them, able to protect themselves, should be held to have such precious rights without impairment. The better reason and the exercise of a broader and sounder justice would be to apply the doctrine of non-immunity to the needy seeker of charity rather than to the stranger. If immunity be based upon public policy I think it misplaced, for it seems to me that a public policy which secures to the individual the right of damages for any wrongs he suffers to his person is superior to that which fosters these great, powerful, charitable institutions. The time has passed when such institutions need the further fostering care of the State. Since their function is kindness and helpfulness to humanity, when they step aside from functioning to such end they should have no immunity

from the commission of wrongs not enjoyed by other corporations engaged in public service. If the wrong is of such magnitude that the imposition of damages for its commission would destroy the charity, then it seems to me that it ought to be destroyed. If the institution is able to pay I can see no reason, if we are to pursue the idea of consistency, why such institutions should not respond to injuries inflicted by servants as well as those inflicted by trustees or managers.

The judgment it seems to me cannot, however, be affirmed. The trial court charged the jury in substance that it was the duty of the university to inspect the chemicals delivered to the students " in order that the possibility of an accident might be avoided."

I think the exception to that language may be found at folio 1736. That it does not state the rule of duty upon the part of the defendant applicable to this case, may not be disputed.

The rule stated is not that of reasonable care but rather that which binds common carriers in the rendition of services to the public. The duty on the institution was not to make the highest, the utmost and greatest effort to eliminate the possibility of injury to its students. (*Topeka City R. Co.* v. *Higgs*, 38 Kan. 375; 5 Am. St. Rep. 760.) It seems, therefore, that such instruction was erroneous.

It is very doubtful too whether the court was correct in charging that the defendant owed the plaintiff the duty of inspecting the chemical materials used in making the experiment described in the case at bar as a matter of law. (*Allison Manufacturing Co.* v. *McCormick*, 118 Penn. St. 519; *Dwyer* v. *Buffalo General Electric Co.*, 20 App. Div. 124; 6 Thomp. Neg. [2d ed.] § 7403, p. 446.)

I think too the learned trial judge erred in admitting the evidence showing another accident, the explosion that occurred some ten minutes or less prior to the accident to the plaintiff, without showing that that accident occurred in a substantially similar manner to that which happened to the plaintiff from a union and heating over a Bunsen burner of the same chemicals used by the plaintiff in the experiment in which she was injured. (*Meiers* v. *Koch Brewery*, 180 App. Div. 450, 454; affd., 229 N. Y. 10; *Withers* v. *Brooklyn Real Estate Exchange, Ltd.*, 106 App. Div. 255.)

The judgment should be reversed and a new trial granted.

Judgment and order reversed upon the law and complaint dismissed, with costs.